Mr. Hillis, good to see you. You may proceed when you're ready. Thank you, Judge. Good morning. May it please the Court, Counsel. My name is Daniel Hillis. I'm with the Federal Public Defender's Office, and I represent Mr. Johnson on this appeal. He raises three claims, and I should note that I don't see Judge Saini, but I hope that you can hear me. I'm here. Yes, I'm here. All right. Very good. Thank you, Judge. And as for Mr. Johnson's three claims, I'll begin by focusing on the FREDA issue. Of course, my client had the right to represent himself, but only upon a valid waiver of his right to counsel, and there was no valid waiver in this case. The District Court never asked the necessary things to establish a valid waiver, and the FREDA colloquy, due to its defects, don't result in a knowing and voluntary relinquishment of the right to proceed with representation through counsel. Would you agree that the magistrate judge conducted inappropriate FREDA inquiry? No, Judge, I don't, and I'll say briefly... What was missing from the magistrate judge's? Sure. So the magistrate judge said that he had the right to representation in this matter, and the matter that was specifically pertinent to that was the initial appearance. The judge didn't discuss the right to counsel throughout the balance of the proceeding, and furthermore, the judge didn't ask even the necessary things for there to be a valid waiver of the right to counsel at the initial appearances. So those things are important. My client is a seventh grade education. He had very limited dealings with the criminal justice system other than the one case in California where the Ninth Circuit said that the record established that he was a fool. So I don't see any of those questions and answers and that information before the court as satisfying the duties under FREDA to make sure that my client has the necessary experience, background, education level, et cetera, to make a knowing and voluntary decision to represent himself. He represented himself, though, throughout a jury trial in California, and where he was convicted and sentenced, he certainly... And he told the court that he had represented himself in half a dozen trials. I know the other ones were civil, but that's a lot more than most defendants coming before a court. Why wouldn't that satisfy the appropriate experience? Certainly, because the difference between civil and criminal cases is enormous. So let's winnow the number down from six relevant cases to one, and then in the one case, if you look at what his performance was, that should have been a very strong indication to the magistrate judge that my client did not have the necessary background and experience to competently represent himself at trial and make that decision. The Ninth Circuit said that, again, he and his co-defendant established by the record that they were fools. That shows a disastrous effort to represent oneself, not a competent ability to represent oneself in the instant preceding. But the problem, it seems to me, is that that California case could just as likely show that he was determined to represent himself, despite his awareness of the risks. We would know that better. We wouldn't have to infer if the district court or the magistrate judge asked the necessary questions, Judge Rovner. And furthermore, there's the whole matter of the nature of the proceeding as it changes and the denial of all of his pretrial motions for subpoenas, etc. Those were important junctures in this case. In the evidence, rather, the posture of the case had changed by the time it made its way from the initial appearance to the final pretrial conference, that the district court should have reweighed this and said, look what's changed. So I'm going to have another examination, and it should be fulsome, and it wasn't. So even if we were to credit what happened earlier. Are you able to point to anything that happened before the trial or at the trial that would lead to the conclusion that he actually was not competent to represent himself? Well, it certainly. Other than his. Other than what? Right. So there are those peculiarities and they can't be ignored. Judge Rovner, you're right. But then also, if we look at the Tenth Circuit case in Hansen, where at the proceeding, the defendant said he dishonored the author from the government. Hansen zeroed in on that correctly. So to say this is a person who doesn't know what's going on when at a criminal case, you're dishonoring an offer that is the equivalent of my client saying he moves to discharge the indictment at the initial appearance. And so the Hansen case, the Tenth Circuit case from 2019, I think that squarely indicates what your honor is getting at about his ability to make an intelligent decision. And that is strong evidence under Hansen to say that he couldn't do that. Mr. Hillis, I got a question for you. It's been troubling me in this case. And with your experience and Mr. Kunin's, maybe you can help me out. You make a good point that on the 2B1.1 issue that the 20, the 21 billion has, you know, it's a complete fiction. There's no reality to it whatsoever. The 30 level or the 30. Yeah, the 30 level offense level enhancement or increase occurs at 550 million, as you guys know. What do you do in a case like this with computing the guidelines? You know that 20 or 21 billion is fiction. I think everyone would agree with that. But the district court has to make a particular finding. You're doing it under the prism of the, you know, quote, intended loss, unquote. How do you go about this? It's not very difficult. I think that McBride and Stockheimer are useful starting points for this. And so if we look at the Sixth Circuit's case in McBride or the Seventh Circuit's case in Stockheimer, you approximate what is reasonable in the case. And you look at the person's intent as well, Judge. So both of those things are at issue here. And if under McBride, you see that there's this fanciful thing where it's almost like the incantation example that the court gives, you would say that you calculate the guidelines and it does have a $20 billion loss. But that is not a reasonable number to use for this proceeding to determine sentence. And sentences should always be reasonable. So if we recognize the unreality of that, then we shouldn't lock ourselves in to a guideline determination. Guidelines have been known to disproportionately affect people by looking at certain things, you know, crack versus powder cocaine, purity of methamphetamine, all sorts of things that under Kimbrough in that line of cases, judges, while they start with the correct guideline calculation, should look to what the actual facts are in the case and then give an explanation for why the sentence is appropriate or not. So Mr. Hillis, is your argument, because I know there was a little bit of confusion in the briefs, you are agreeing that the court, as a pure factual matter, accurately calculated the guidelines? You're just challenging and saying that the district court procedurally erred by not considering the intent of your client, which you could infer from the $21 billion unrealistic figure? Both the intent and the lack of economic reality. But you agree that the guidelines, that the intended loss as a pure factual matter was correctly calculated. Your argument is that a variant should have been taken based on that. Is that correct? Absolutely. And that the lack of concern that the judge said in giving out the sentence, his failure to account for that principle argument, with this limited record, it shows that you cannot determine the reasonableness of the sentence based on the limited exchange between the judge and my client on that. And just briefly, unless the court has questions about the sentence, the 216-month sentence that essentially is going to confine my client to prison until his death, because the present sentence he'll live to be 81 years old under the actuarial tables, maybe less. The sentence keeps him in prison until 88 years old. And that is contrary to the noble tradition that the courts have had about not condemning a person to death through the life imprisonment. And that's what resulted here in this case. I'm sorry. With that, I reserve the balance of my time, unless the court has further questions. Very well. Thank you, Mr. Hillis. Mr. Coonan. Thank you. Thank you. Good morning, your honors. May it please the court and counsel. My name is Liam Coonan. And today we're dealing with a defendant who was previously convicted of murder in Illinois. He manages to perpetrate another fraud. This is somebody who just got sentenced in Northern District of California to 300 months of imprisonment. And if I may make a quick segue, I mean, that kind of explains why he's kind of up against, you know, a possible life sentence of sorts. I'm not exactly embracing that expression, but it's because of that. And so in 2014, he comes to the communications management unit at USP Marion. And in 2018 is when he commits the underlying crimes and dispute. So he was there four years. Forgive me. Given that Johnson's intended loss was, look, look, it's so absurd and impossible. Does the whole thing is so crazy. But that's not a scientific term. Does an effective life sentence strike you as at all unreasonable? Well, no, your honor. But let me try to say this with a little more compassion than just me saying no. You know, he's brought it upon himself. He brought on the 300 months sentence in California. He's brought this situation on his own. It's he's he's, you know, part of the thing, the kind of underlying theme is that he's harassing folks like federal folks throughout, you know, whether it's attorneys, judges, BOP officers, that's his been his history. And so some of the things that we see, for example, you know, the dishonor offer is what I'm not saying he's a sovereign citizen, but I'm not saying he's not. And it's it's that that type that we're dealing with. As far as the sensing goes, there is a built in buffer. You know, it's a nonviolent sentence he's getting. So he could be eligible for different things like, first of all, for BOP to consider any compassionate release for then the courts to mull over a compassionate release. You also have good time credit, which I imagine he could have been building up a little better had he not been committing crimes. So there are things that are out there and it's it's a below guideline sentence, Your Honor. So it's it's so I you know, I you know, I do care about human life. And the judge did, too, by hoping that he gets out and, you know, and lives to get out. But that the judge noted that he was a healthy human. You know, you you said in your brief that Johnson's scheme been less absurd. It could have been taken more seriously and inflicted real harm. But you also suggested that no larger downward departure was needed because Johnson's crimes were calculated and harmful. Are these two lines of argument inconsistent? Was this I mean, was this scheme, in fact, absurd or was it indeed actually intended to cost 20 billion dollars in losses? Well, he says it's intent. Sorry, Your Honor. Go ahead. He says he was intended as much the end. But was it possible what it went through the court system? It went through the bankruptcy court. And then, you know, the bankruptcy court was, you know, with the help of an AUSA, was able to kind of seal the documents before it had the effect of ruining two BOP's credit scores. And plus, he had 28 other identifiers that he had memorized that he was going to put into the same mix. So you have somebody it's not just not just the money. It's it's the the inflicting harm on government employees. So I think that was your honor. That was probably the problem. The way I briefed is I I certainly did not make that clear. And I apologize to the court. You know, you have to apologize for nothing. Thank you. But did I answer your question, Your Honor? I think it was there. And I know there's a previous question as to if the court still wants me to try to tackle Section 2B 1.1 and the commentary. Now, what I was wondering if there was any evidence in the record to support the claim that Johnson had, in fact, met with the assistant public federal defender before his initial appearance. The federal defender was present at that initial appearance. But the question is, you know, whether they had actually consulted. Well, Your Honor, I I do not know if it's in the record. And I apologize. It's kind of what we're used to down here in the Southern District of Illinois is the public defender. And I think all the panel attorneys do the same thing. They meet with the client ahead of time and they kind of, you know, they find out, you know, so they know if there is a concern before all sudden they're in front of the initial appearance in front of the magistrate judge. So, you know, not only would they be focusing on an issue like this, whether this person really wants the public defender or not, but they'd be focusing on issues as far as detention, regular mental capacity. And so that's why, you know, that's why our courts have that routine, Your Honor. But and then it's very helpful because, you know, then the judge, like the magistrate judge, Judge Daley had her questions ready to go. And if we notice from that transcript, they go it flows seamlessly into the question. So it's very helpful that our courts do that to let everybody know, because in other situations, Your Honor. Mr. Hillis, though, is pointing out, is he not, you know, fairly that that colloquy by its terms doesn't purport to be self-representation for all purposes. Right? Well, it's it's for all the legal proceedings. No, it's for the matter. It's for the arraignment. I mean, that unless I've Well, there there was no asking for any kind of for the hearing after the hearing. There was and the one thing the judge did do is bring it up. It's not the defendant's obligation to ask for a hearing. It's the court's obligation to make sure the defendant is aware of the pitfalls of representing himself and make sure that he is knowingly and voluntarily and intelligently deciding to do so. You can't put that on the defendant. Well, I'm sorry, Your Honor, I may have been jumping ahead as far as time scale. He's advised about proceeding criminally without an attorney. The colloquy goes into the effect that he's advised that he should have an attorney and at one point even a standby attorney and he refuses that he's he can and also by the way of motions and anything that would happen after the initial appearance, the judges would also be able to kind of say, hey, we better revisit this and do some things to respond to it if necessary. And that's you know, that would be what I I would submit as kind of like the bridge between the initial appearance and the final pre-trial conference. The final pre-trial conference though it revisited it revisited the Feretta issue but in an extremely abbreviated way. And I know Mr. Hillis joins issue with the colloquy with the magistrate judge but I think one of the points that I took away from his brief is that at the very least there should have been a full and complete Feretta hearing before trial kicks off. I mean, this guy's facing, I mean, facing major time. Need a life sentence. Well, Your Honor, I would say that he had two hearings, two formal hearings. And if we look at the whole record, if we look at the totality of the circumstances, you know, if not each judge by themselves and certainly by both judges advising him. What's the second hearing, Mr. Kuhnert? Is the second hearing the one in front of Judge Gilbert? Is that what you have in mind? Well, I'm sorry, Judge, I was looking at his right, his constitutional, I'm sorry, the defendant's constitutional right to proceed pro se throughout. So I have to admit, I was looking at both hearings, Your Honor. Are you considering what was stated at the pre-trial hearing? Well, yeah, yes, Your Honor. On Feretta? Yes, Your Honor. The judge, it was a final pre-trial, so the judge is dealing with all the pre-trial issues and Feretta was one of those issues that the judge, you know, revisited and said, are you sure you want to do this? And, you know, he indicated that by an expression like, this ship has sailed, that he did want to proceed and continue to proceed. And the judge asked him questions. Not a lot. Yeah, not very many questions. Well, he, well, the judge would have known that by the fact that he was pro se that he, and he was granted that to proceed earlier, that he was in a good position and through all the pleadings that were filed by the pro se defendant, that, you know, he knew what questions he was going to ask. And the United States admits that each judge asked the right question. The pleadings weren't all that inspiring. He asked for some, I think a prosecutor or somebody to be mentally examined. Right. Yeah, and that would go to his second thing is harassment. Okay. I think we understand the government's position. Thank you very much, Mr. Kuhn. And Mr. Hillis, you've got a minute or so. Thank you, Judge. So the court shouldn't look to facts outside the record to determine if there was conferral between the federal public defender or the defendant in advance of the hearing. The record doesn't show that there was. The presumption must be that there wasn't. Furthermore, the tradition seems to be in the courts and in particular in the Southern District of Illinois, that there is a specific phoreticology, a hearing rather, that's devoted to the issue. And Thornton was a case that we cited in the brief where that exactly was done. This is an important thing. It's not meant to be bookended and done in succinct fashion in a final pretrial conference. And especially the case where motions had been denied, things have happened. That is something that the judge should be reweighing through a very full phoreticology at that point, not piggybacking on things that happened that he doesn't even especially know at the time of the initial appearance. And then lastly, because something went to the bankruptcy court doesn't mean that the scheme was possible and the loss was therefore intended in the sense the guidelines regard that issue. This is still an impossible amount of loss. The district court said so, and yet the district court breezed past that fundamental thing in imposing a sentence that's a life sentence here. So for these reasons, we ask the court to vacate and remand, order a new trial. At the very least, there should be a new sentence. Okay. Gentlemen, thanks to both of you. We'll take the case under advisement, and the court will stand in recess. Thank you.